UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MATTHEW J. TUTTLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-30064-KAR |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE
COMMISSIONER'S DECISION
(Docket Nos. 18 & 23)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Matthew J. Tuttle ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking

review of a final decision of the Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

(the "Act"), 42 U.S.C. § 401 *et seq.*  Plaintiff applied for DIB on May 30, 2017 alleging a

September 1, 2015 onset of disability due to chronic regional pain syndrome ("CRPS") of his

dominant left hand and depression (Administrative Record "A.R." at 42, 182).  After a hearing,

the Administrative Law Judge ("ALJ") found that Plaintiff was not disabled from September 1,

2015 through February 22, 2019, the date of the decision, and denied his application for DIB

(A.R. at 42-59).  The Appeals Council denied review on March 3, 2020 (A.R. at 1-7) and, thus,

Plaintiff is entitled to judicial review.  *See Smith v. Berryhill,* 139 S. Ct. 1765, 1772 (2019).

Plaintiff seeks remand or reversal based on his claims that the ALJ erred by failing to afford sufficient weight to Plaintiff's statements concerning the severity of his symptoms and by failing to find that depression was a severe impairment. Pending before this court are Plaintiff's motion for judgment on the pleadings (Dkt. No. 18), and the Commissioner's motion for an order affirming his decision (Dkt. No. 23). The parties have consented to this court's jurisdiction (Dkt. No. 17). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons discussed below, the court grants Plaintiff's motion, denies the Commissioner's motion, and remands the case for further proceedings consistent with this memorandum and order.

II.   FACTUAL BACKGROUND

A.   Plaintiff's Educational Background, Work History, and Daily Living Activities

Plaintiff was 45 years old on the date of the hearing in January 2019 (A.R. at 142, 278). He earned a GED in 1994 (A.R. at 305). He stopped working on September 1, 2015 when he injured his dominant left hand while assembling medical equipment (A.R. at 148, 167, 305, 336).

In function reports dated July 11 and October 2, 2017, Plaintiff indicated that he was not able to use his left hand to pull on his pants and shoes, or to fasten zippers, buckles, and buttons while dressing (A.R. at 368, 374). He was not able to cut his food (A.R. at 368). The limits on his ability to use of his left hand made it difficult to wash the right side of his body, wash and brush his hair, and shave (A.R. at 368). Although he was able to prepare frozen dinners and sandwiches, he was not able to prepare meals that involved cutting, opening cans, or other actions that required the use of two hands (A.R. at 333, 368, 369). He was able to do laundry with his right hand (A.R. at 333, 369). In addition, he was able to drive and walk the dog (A.R. at 368, 370). He required assistance to shop for food (A.R. at 370).

B.   Relevant Medical History

1.    Medical Records Concerning Treatment of Plaintiff's Left Hand

Plaintiff first visited Steven M. Wenner, M.D., of New England Orthopedic Surgeons, Inc., on September 16, 2015 for a work-related injury to his left hand (A.R. at 481).  He complained of "exceedingly severe and incapacitating" pain in his left wrist and thumb after he felt a "sudden pop" in his left thumb while turning a screw (A.R. at 481).  Plaintiff was reluctant to allow Dr. Wenner to touch or manipulate his left forearm, wrist, and hand (A.R. at 481).  X-rays showed no bone or joint abnormality or area of calcification (A.R. at 481).  An electroneurometer ("ENM") study of the median nerve of the left wrist was normal (A.R. at 481, 616).  Dr. Wenner applied a short-arm fiberglass cast, prescribed a Medrol Dosepak, and indicated that Plaintiff should remain out of work until his recheck the following week (A.R. at 481).

Dr. Wenner reexamined Plaintiff on September 25, 2015 (A.R. at 482).  Plaintiff reported that the cast and the Medrol Dosepak did not relieve the "episodes of incredibly severe pain that [brought] him to his knees" (A.R. at 482).  He stopped taking the Medrol Dosepak after a "couple days" because "he did not like the way it made him feel" (A.R. at 482).  Plaintiff struggled to make a tight fist and fully extend the fingers of his left hand (A.R. at 482).  Because Plaintiff was "generally reluctant to take medicine," he declined Dr. Wenner's suggestions of gabapentin and ibuprofen (A.R. at 482).  Dr. Wenner suspected an "irritated nerve," tentatively diagnosed a mononeuropathy, recommended a consultation with a neurologist, Michael Sorrell, M.D., and indicated that Plaintiff could not return to work (A.R. at 483, 616).

Plaintiff visited Matthew Charles, D.C., at New Beginnings Chiropractic, P.C., for treatment on October 7, 2015 (A.R. at 579).  Plaintiff reported that the pain in his left wrist and hand was "'unpredictable' in that it 'happen[ed] with certain movements and at times [was] not

painful (with the same movements)'" (A.R. at 579).  Dr. Charles witnessed Plaintiff experiencing

"severe pain" in his left hand "multiple times" during the visit (A.R. at 579).  Plaintiff's

apprehension about pain limited Dr. Charles' ability to test the active range of motion ("AROM")

and passive range of motion of ("PROM") of Plaintiff's left hand and fingers (A.R. at 579).  Dr.

Charles ordered an MRI (A.R. at 580).

The October 18, 2015 MRI studies of Plaintiff's left hand and wrist showed a "[s]mall

amount of soft tissue edema within the palmar soft tissues of the first digit at the level of the first

M[C]P joint" of the hand (A.R. at 581, 600, 677).[1]  As to Plaintiff's left wrist, there was no

evidence of ligament or tendon tears, but there was mild extensor carpi ulnaris tendinopathy

(A.R. at 602, 679).  "Scattered, small foci of increased T2 signal within the distal radius, ulna

and carpal bones is a nonspecific finding that can be seen with RSD/[CRPS] and/or disuse

osteopenia" (A.R. at 602, 679).[2]

Plaintiff began chiropractic care with Dr. Charles on October 21, 2015 and was treated on

October 22, 26, 28, and November 2, 4, and 9, 2015 (A.R. at 581-84).  On November 10, 2015,

Dr. Charles reported that Plaintiff showed little or no improvement from the chiropractic

treatments (A.R. at 585).  The examination on that date revealed that flexion of Plaintiff's thumb

produced the most intense pain and radial deviation and wrist extension elicited "severe pain"

along the palmer surface of the hand and the lateral forearm (A.R. at 585).  Dr. Charles

---

[1] The metacarpophalangeal ("MCP") joint "is where the finger meets the hand."  *Nyberg v. Zurich Am. Ins. Co.,* 220 F. Supp. 3d 1114, 1119 n.14 (D. Kan. 2016).

[2] Reflex Sympathetic Dystrophy Syndrome ("RSDS") is synonymous with CRPS and Plaintiff's medical records use both terms.  *See* Social Security Ruling ("SSR") 03-2p, 2003 WL 22399117, at *1 (Oct. 20, 2003).  The court will refer to Plaintiff's impairment as CRPS.

discontinued Plaintiff's chiropractic care and recommended ultrasound underwater therapy of the first metacarpal joint and the palmer surface of the left hand (A.R. at 585).

Plaintiff visited Neal C. Hadro, M.D., of Baystate Vascular Services, on November 6, 2015 (A.R. at 826). Dr. Hadro observed "a little atrophy" in Plaintiff's left forearm and "somewhat limited" ROM in his left wrist (A.R. at 826). Dr. Hadro did not think that Plaintiff's injury involved a vascular component (A.R. at 826). He recommended physical therapy and treatment by a physical medicine and rehabilitation specialist for pain relief (A.R. at 827).

Plaintiff continued to "complain bitterly" about the pain in his left hand during his November 6, 2015 visit to Dr. Wenner (A.R. at 484). The examination of Plaintiff's left elbow, forearm, wrist, and fingers revealed impaired active movement and full passive movement in the wrist and hand (A.R. at 484, 617). Dr. Wenner noted mild swelling of Plaintiff's thumb and "some evidence of vascular instability" (A.R. at 484). Because there were "enough findings to suggest a sympathetically mediated pain syndrome," Dr. Wenner referred Plaintiff to a pain management clinic for possible nerve blocks (A.R. at 484, 617). Dr. Wenner indicated that Plaintiff should not return to work until Dr. Sorrell examined him (A.R. at 484).

On November 19, 2015, Plaintiff underwent an evaluation for occupational therapy ("OT") services at Baystate Rehabilitation (A.R. at 422). Plaintiff presented with "frequent left hand 'spasms' of pain when at rest" and reported constant intense pain of 9 on a scale of 1 to 10 in his thumb, which was aggravated by movement (A.R. at 422, 423). Plaintiff's left hand was discolored, sweating abnormally, and hypersensitive (A.R. at 422). His fine and gross motor skills were impaired and his left hand and wrist displayed decreased ROM, strength, and functional status (A.R. at 423). Plaintiff attended OT sessions, which included ultrasound water therapy, on November 24, 25 and 30, 2015, December 3, 9, 11, 15, 17, 22, 24, 28, and 30, 2015,

January 4, 7, 11, 14, 20, 22, 27, and 29, 2016, and February 1 and 3, 2016 (A.R. at 427, 429, 430, 433, 435, 437, 439, 443, 446, 449, 452, 453, 456-57, 460, 462, 465, 467, 469, 471, 474, 477, 478).  He was discharged due to potential surgery (A.R. at 479).

On November 20, 2015, Plaintiff underwent an initial evaluation at the Baystate Health Pain Management Clinic for pain in the radial aspect of his left thumb/wrist junction (A.R. at 674).  Plaintiff described the pain as "ache, pressure, stabbing, burning, cold, tingling, [and] electric," which lasted all day, every day, had averaged 8/10 in intensity during the prior week, and increased with the active use of his thumb (A.R. at 675).  Pain interrupted his sleep (A.R. at 676).  Although Plaintiff was able to bathe, dress, ambulate, and shop independently, he indicated that he had "'reconfigure[d] [his] whole world'" because the use of his dominant left hand was "significantly limited" by pain (A.R. at 676).  Plaintiff took Aleve every other day and used marijuana daily for pain relief.  He did not want to take opioids (A.R. at 676).  The examination of Plaintiff's left hand revealed swelling of the palmar aspect of the hand including all fingers, a pinkish hue and mottling of the skin over the dorsal hand's second through fifth metacarpal joints, and slightly "'glossy,'" sweaty, and moist skin as compared to the skin of the right hand (A.R. at 679).  Plaintiff was not able to fully extend the fingers of his left hand or to fully flex the MCPs, and proximal and distal interphalangeal ("IP") joints (A.R. at 679).[3]  "There was tenderness to palpation over the left wrist volar aspect in the region overlying the level of

---

[3] "'The finger joints work like hinges when the fingers bend and straighten. The main knuckle joint is the metacarpophalangeal joint (MCP joint).  It is formed by the connection of the metacarpal bone in the palm of the hand with the finger bone, or phalange.  Each finger has three phalanges, separated by two interphalangeal joints (IP joints).  The one closest to the MCP joint (knuckle) is called the proximal IP joint (PIP joint).  The joint near the end of the finger is called the distal IP joint (DIP joint).'"  *Farr v. Astrue*, Civil Action No. G-10-205, 2012 WL 6020061, at *8 n.9 (S.D. Tex. Nov. 30, 2012) (citation omitted).

the scaphoid, trapezium, and thumb base roughly" (A.R. at 679). Plaintiff was diagnosed with CRPS Type I of the left upper thumb (A.R. at 680). The clinician recommended a series of brachial plexus blocks immediately before OT so that Plaintiff could tolerate therapy and hasten recovery (A.R. at 680). However, workers' compensation would not cover the recommended pain clinic treatments (A.R. at 670).

Plaintiff visited Dr. Sorrell on November 24, 2015 (A.R. at 587). Plaintiff indicated that, when he used his left hand, he experienced a "dull ache" with sharp pains in the wrist and thumb, twitches in the pad of his thumb, and pins and needles in the volar thumb or the adjacent wrist (A.R. at 587). The pain in his wrist and thumb ranged from 3/10 to 10/10 (A.R. at 587). He experienced symptoms 10 to 15 times per day (A.R. at 587). Dr. Sorrell's examination revealed that Plaintiff's hand was "slightly blue" and swollen and its dorsal and volar aspects were "very sensitive" to touch (A.R. at 587, 589). Plaintiff's left hand motor strength was "weak" and there was twitching of the thenar eminence (A.R. at 589).[4] Dr. Sorrell diagnosed traumatic median nerve distal neuropathy with signs of ulnar nerve involvement (A.R. at 590). Plaintiff's condition was consistent with at least two mononeuropathies, probably at the wrist, but with the possibility of neuronal complications more distally (A.R. at 590).

The record of Plaintiff's December 11, 2015 visit to Dr. Wenner indicates that Plaintiff's condition had changed since his prior visits (A.R. at 485, 617). Dr. Wenner noted "mild weakness" of the "ulnar nerve innervated intrinsics to the hand" and the thenar muscles (A.R. at 485). Plaintiff had a "marked degree of hypersensitivity at the tip of his thumb" and a "mild degree of hypersensitivity at the tips of the other median nerve innervated digits" (A.R. at 485).

---

[4] "The 'thenar eminence' is the mound on the palm at the base of the thumb." *Horbock v. Barnhart,* 210 F. Supp. 2d 125, 134 n.14 (D. Conn. 2002).

7

Dr. Wenner indicated that Plaintiff could not return to work until Dr. Sorrell conducted electrical testing (A.R. at 485).

The record of Plaintiff's December 15, 2015 OT visit indicates that he had made "some progress" (A.R. at 440). He demonstrated increased AROM in his wrist and second, third, fourth, and fifth fingers (A.R. at 440). The therapist nonetheless noted that "hypersensitivity of [the] left hand and wrist, extreme pain, muscle spasms, [and] limited AROM" continued to restrict the function of Plaintiff's left hand (A.R. at 440).

Dr. Sorrell's December 22, 2015 nerve conduction studies revealed evidence of mild, but definite, current denervation in the abductor pollicis brevis, which might indicate that the muscle had denervation from both the median and ulnar components (A.R. at 604, 605). The findings were consistent with a mild primarily motor distal median neuropathy (A.R. at 604).

On January 7, 2016, the OT record noted that Plaintiff participated in all OT activities and a home exercise program (A.R. at 460). He was making "some gains," but had difficulty tolerating touch and experienced "debilitating pain" during all visits (A.R. at 460).

The record of Plaintiff's January 8, 2016 visit to Dr. Sorrell indicates that Plaintiff's condition was unchanged since the first visit, but sensation was "relatively increased on the medial aspect of the left thumb and lateral of the index finger" (A.R. at 595). Dr. Sorrell diagnosed mononeuropathy and left traumatic median mononeuropathy caused by his hand movement while working on September 1, 2015 (A.R. at 595). Dr. Sorrell found that Plaintiff was "totally incapacitated" until his reexamination on March 8, 2016. The doctor was not able to predict when Plaintiff would improve enough to resume his job (A.R. at 591, 614).

On January 15, 2016, based on the findings of Dr. Sorrell's electrical testing, which were consistent with left carpal tunnel syndrome ("CTS"), Dr. Wenner injected Kenalog into Plaintiff's

left carpal tunnel because Plaintiff continued to experience "considerable pain and some numbness and tingling in the hand" (A.R. at 486).[5]  Dr. Wenner indicated that Plaintiff should continue OT and remain out of work (A.R. at 486).

The record of Plaintiff's January 20, 2016 OT session indicated that Plaintiff experienced "[s]ignificant pain and edema with all use [of his] left hand involving [the] thumb for grasping and manipulating objects.  [Plaintiff was] diligent with attempted left [hand] use for driving and simple ADLs with pain and difficulty" (A.R. at 467).  On February 3, 2016, Plaintiff experienced burning pain and throbbing with prolonged stretching into a composite fist and was hypersensitive to touch in his left hand (A.R. at 478).

During Plaintiff's February 5, 2016 visit to Dr. Wenner, Plaintiff reported that the injection into the carpal tunnel reduced his pain and improved his finger movement (A.R. at 487).  However, he continued to struggle to flex his left index finger and complained of tingling in his left index and long fingers, occasionally in his thumb, and pain through his palm (A.R. at 487, 617).  Dr. Wenner observed "mottled discoloration" of Plaintiff's left hand, which was consistent with vascular instability (A.R. at 488).  Based on Dr. Wenner's observations of Plaintiff's "diminished sensibility in the median distribution" of his left hand, paresthesias in the median distribution, difficulty making a tight fist, and pain in the palm, Dr. Wenner advised Plaintiff that his symptoms and findings were consistent with CRPS of the left hand, which was "most likely attributable to [CTS]" (A.R. at 487-88).  Dr. Wenner recommended left carpal tunnel release surgery and scheduled the surgery for the following week contingent on workers' compensation's approval (A.R. at 488, 489).  Workers' compensation did not approve the surgery

---

[5] "Carpal tunnel syndrome [CTS] is the compression of the median nerve as it passes through the carpal tunnel in the wrist."  *Horbock,* 210 F. Supp. 2d at 129 n.6.

(A.R. at 491, 618).  On March 24, 2016, Dr. Wenner attested that Plaintiff remained "disabled from his work because of severe pain in the hand" (A.R. at 618).

Plaintiff visited Dr. Wenner again on May 6, 2016 (A.R. at 491).  Plaintiff continued to complain of "severe incapacitating pain in the thumb and index fingers of his left hand," which occurred "sporadically and without warning" (A.R. at 491).  Dr. Wenner reported that Plaintiff "writhed in pain" several times during the visit (A.R. at 491).  Dr. Wenner's examination revealed "a tremendous degree of skin hypersensitivity" in Plaintiff's thumb and index finger such that he would not permit Dr. Wenner to touch them (A.R. at 491).  The active movement of those two fingers was "markedly impaired" by pain (A.R. at 491).  Dr. Wenner recommended electrical tests to confirm the diagnosis of CTS (A.R. at 491).  If CTS was confirmed and workers' compensation approved, Dr. Wenner again recommended carpal tunnel release surgery and pain management (A.R. at 491-92).

On May 24, 2016, Plaintiff saw Teresa Pianta, M.D., of Hampshire Orthopedics for a second opinion (A.R. at 545).  Plaintiff reported that his left hand was "getting worse," that gabapentin made him dizzy and was not effective, but medical marijuana was somewhat helpful in relieving the pain (A.R. at 545).  Plaintiff described shooting pain along the dorsal aspect of his thumb, pins and needles and a "squeezing sensation" in his thumb and index finger, and swelling (A.R. at 545).  He had limited functional use of his left hand and even simple tasks were "exquisitely painful" (A.R. at 545).  Upon examination, Dr. Pianta noted that Plaintiff's wrist range of motion showed flexion to 65 degrees on the right and 47 on the left and extension to 55 degrees on the right and 35 on the left (A.R. at 546).  He had full digital range of motion on the right side with full flexion of the distal palmar crease, full extension, and thumb opposition to the base of the small finger (A.R. at 546).  On Plaintiff's left hand, Dr. Pianta observed that, unlike

the skin on the long, ring, and small fingers, the skin on his thumb and index finger was "shiny and lack[ed] normal wrinkles and rugal patterns" (A.R. at 546). Although Plaintiff could flex the long, ring, and small fingers to his palm, the ROM of the thumb and index finger was "significantly limited" (A.R. at 546). He "grimaced" while trying to touch his thumb to the tip of his middle finger (A.R. at 546). Dr. Pianta noted that Plaintiff had "exquisite hypersensitivity to even the finest light touch at the thumb and index fingers of the left hand" (A.R. at 546). Dr. Pianta diagnosed reflex CRPS of his left upper extremity, mostly affecting his thumb and index fingers (A.R. at 546). Dr. Pianta recommended that Plaintiff participate in an OT program that was directed toward desensitizing his left hand (A.R. at 546).

Plaintiff was admitted to an outpatient OT program at HealthSouth on June 15, 2016 (A.R. at 494). He reported constant throbbing pain in his left hand on that date (A.R. at 497). Plaintiff indicated that he required his wife's assistance with activities of daily living (A.R. at 498). Specifically, Plaintiff had difficulty using his left hand for all fine motor activities including handwriting, picking up objects, cutting his meat, grooming, buttoning, zipping, and tying (A.R. at 498, 499). Contractures were noted at the proximal and distal IP joints of the index finger and the carpometacarpal ("CMC"), MCP, and IP joints of the thumb (A.R. at 498).[6] It was "very difficult" for the therapist to assess the PROM of Plaintiff's left hand because it was hypersensitive to touch (A.R. at 498). Decreased ROM was noted in Plaintiff's index finger and a "significant" decrease in ROM was noted in his thumb (A.R. at 498). He was not able to oppose his thumb to his small finger (A.R. at 499). The grip strength in his left hand was 5 pounds, well below the mean grip strength for a person of his age and gender (A.R. at 499).

_____

[6] "[T]he carpometacarpal [CMC] joint . . . is the joint between the wrist and fingers." *Horbock,* 210 F. Supp. 2d at 132 n.12.

Plaintiff was diagnosed with CRPS and his rehabilitation potential was assessed as "fair" due to the "[s]everity of [his] impairment" (A.R. at 499, 500).

The record of Plaintiff's June 23, 2016 visit to Dr. Pianta indicates that the range of motion of his left hand and his hypersensitivity to touch of his thumb and index finger had not changed since his initial visit (A.R. at 543).  Dr. Pianta encouraged Plaintiff to continue the desensitization, scrubbing, and stress loading OT at HealthSouth (A.R. at 543).

On July 21, 2016, Plaintiff complained to Dr. Pianta about the "extreme" pain he experienced during OT, but noted that his hand seemed more mobile, especially the long, ring, and small fingers, but he was "functionally impaired and in pain" (A.R. at 541).  The left index finger and thumb remained "very stiff" (A.R. at 541).  He could oppose the thumb to the tip of his small finger, but the index finger lacked active proximal IP flexion and he could only come to about 4 cm. of the distal palmar crease (A.R. at 541).  Although the color of his left hand had improved, the skin was still shiny and lacked normal skin wrinkling, particularly on the radial side when compared to his right hand (A.R. at 541).  Plaintiff could not tolerate touching for examination (A.R. at 541).  Dr. Pianta recommended continued therapy and the possibility of stellate ganglion blocks (A.R. at 542).  She shared Plaintiff's view of the lack of benefit of narcotic medication (A.R. at 542).

Plaintiff returned to the Baystate Health Pain Management Clinic on September 2, 2016 (A.R. at 670).  He indicated that OT had improved the function of his hand and he wanted to continue therapy if workers' compensation agreed (A.R. at 671).  He reported "severe" (10/10) left hand pain  (A.R. at 671).  Finger opposition, wrist flexion, and wrist extension of his left

hand were 3/5 (A.R. at 672).  There was allodynia of his left arm (A.R. at 673).[7]  The Pain

Management Center evaluator recommended that Plaintiff continue with OT because it was "the

main therapy for CRPS" (A.R. at 673).  However, workers' compensation again denied coverage

for the administration of the recommended series of brachial plexus blocks prior to OT (A.R. at

670, 673).

During Plaintiff's September 8, 2016 visit to Dr. Pianta, he indicated that OT reduced the

stiffness in his left hand, but not the amount of pain he experienced (A.R. at 539).  Although

some days were better than others, the pain was "fairly constant" (A.R. at 539).  He stated that he

had difficulty performing simple tasks such as petting his dog or touching his skin (A.R. at 539).

During the visit, Plaintiff held his left hand in his lap and did not use it at all (A.R. at 539).  He

"recoil[ed] and grimace[d]" when Dr. Pianta attempted to examine his hand (A.R. at 539).  The

range of motion of his index and middle fingers had improved in that he could flex to touch his

palm and had "good" extension (A.R. at 539).  However, he experienced "severe pain in the volar

radial aspect of his wrist and base of his thumb" when he opposed his thumb to the tip of his

small finger (A.R. at 539).  According to Dr. Pianta, "at this point [Plaintiff] is not capable of any

meaningful use of his left hand" because of "significant" pain (A.R. at 540).

Plaintiff was discharged from OT at HealthSouth on October 5, 2016 after 23 visits

(A.R.. at 507).  OT improved the ROM and mobility of his left hand and wrist, but the pain,

which Plaintiff described as pins and needles, sharp, cramping, and throbbing, continued to range

from 2/10 to 10/10 (A.R. at 509).

---

[7] "Allodynia is '[t]he distress resulting from painful stimuli.'"  *Bratnichenko v. Berryhill,* Case
No. 3:18-cv-30110-KAR, 2019 WL 3281275, at *5 n.5 (D. Mass. July 19, 2019) (alteration in
original) (quoting STEDMAN'S MEDICAL DICTIONARY 47 (25th ed. 1990)).

On October 6, 2016, Armand A. Aliotta, M.D., a neurologist, conducted an independent medical examination of Plaintiff for the Commonwealth of Massachusetts Department of Industrial Accidents (A.R. at 830). Dr. Aliotta noted the "slightly bluish" skin of Plaintiff's hand and that "light touch [could] produce severe exquisite pain" (A.R. at 831). Allodynia prevented aggressive testing (A.R. at 831). Dr. Aliotta diagnosed CRPS in either the radial or median distribution of the Plaintiff's left hand, which was caused by his work-related injury on September 1, 2015 (A.R. at 831). Dr. Aliotta concurred in the opinion that Plaintiff should receive a stellate ganglion block (A.R. at 831).

The record of Plaintiff's October 13, 2016 visit to Dr. Pianta indicated that OT improved his range of motion, but not his pain (A.R. at 537). Plaintiff reported that pain in his left hand prevented him from being able to pull up his pants or pet his dog with his left hand (A.R. at 537). He also indicated that workers' compensation discontinued coverage for OT (A.R. at 537). The examination revealed that the overall ROM of Plaintiff's thumb, index, and middle fingers had improved, but he remained hypersensitive to even the slightest touch (A.R. at 537). According to Dr. Pianta, although OT was "excellent at achieving what motion is possible out of his hand," it did not relieve his pain (A.R. at 537). Dr. Pianta indicated the Plaintiff's condition could not be treated with surgery, but stellate ganglion blocks could be effective in treating CRPS (A.R. at 538). Dr. Pianta noted that she "did not have much more to offer" Plaintiff (A.R. at 538).

On December 1, 2016, Plaintiff received a stellate ganglion block at the Baystate Health Pain Management Center (A.R. at 668). On December 9, 2016, Plaintiff reported increased pain after he received the stellate ganglion block (A.R. at 664).

On January 24, 2017, the Pain Management Center recommended six brachial plexus nerve blocks to coincide with Plaintiff's OT sessions at HealthSouth (A.R. at 513, 663). Plaintiff

14

received nerve blocks on February 22, February 24, March 2, March 7, March 23, and March 30, 2017 (A.R. at 643, 644-46, 647-49, 650-52, 653-55, 656-58, 659-61). He reported that the treatments helped to increase his range of motion, although the pain relief was short-lived (about 12 hours) and there was no improvement in pain severity thereafter (A.R. at 641, 645, 647-48, 651, 654, 656).

During Plaintiff's initial OT assessment at HealthSouth on February 17, 2017, he described his pain as varying in intensity and type (A.R. at 513). He had difficulty writing, picking up small items, holding a washcloth, buttoning, zipping, tying, and carrying and lifting objects (A.R. at 514, 515). He was not able to make a complete fist with his left hand and was hypersensitive to touch (A.R. at 514, 516). His treatment focused on improving his left hand's atrophy, decreased function and mobility, extreme weakness, hypersensitivity, lack of coordination, and pain, and his left wrist's hypomobility (A.R. at 516-17). Plaintiff's rehabilitation potential was assessed as no better than "fair" due to the severity of his impairment (A.R. at 516).

On April 11, 2017, Dr. Malik of the Pain Management Center described Plaintiff's left hand pain as "intractable" (A.R. at 643). Dr. Malik discussed options including ketamine infusions and trials of a membrane stabilizer and spinal cord stimulation (A.R. at 641, 643). Plaintiff "'wanted to think about it further'" (A.R. at 641, 643).

When Plaintiff returned to Dr. Pianta on April 25, 2017, he reported that although he had received a trial of a stellate ganglion block, which made his symptoms worse, six axillary nerve blocks temporarily relieved his pain during OT (A.R. at 534). Examination of Plaintiff's left hand showed stiff fingers, particularly his thumb, index, and middle fingers (A.R. at 534). His thumb opposition was limited (A.R. at 534). In addition to the skin of his left hand being shiny

and lacking normal wrinkles, it was purplish and discolored, particularly the palm (A.R. at 534).

During the examination, Dr. Pinata observed "fasciculations and twitching through the thenar

musculature which occurred out of the blue and resulted in extreme pain" for Plaintiff (A.R. at

534).  Dr. Pianta understood Plaintiff's reticence to take chronic pain medication because of the

possible side effects and to undergo the suggested invasive treatment options, such as spinal cord

stimulation, because a clear benefit could not be guaranteed (A.R. at 534-35).  Dr. Pianta

repeated her opinion that surgery was not in his best interest (A.R. at 535).

Plaintiff was discharged from OT at HealthSouth on May 4, 2017 (A.R. at 520).  The

ROM of his left hand had improved, "but pain continue[d] to progress and prevent . . . functional

use" of his hand (A.R. at 522, 524).  For example, he completed finger opposition with 10/10

pain (A.R. at 522).  Coordination testing of Plaintiff's left hand showed that he still had difficulty

with fine motor coordination activities such as handwriting, picking up small items, carrying and

lifting objects, and using tools (A.R. at 522).  He was not able to "complete pinches" (A.R. at

522).

Plaintiff visited Dr. Pianta on May 16, 2017 to discuss a nuclear bone scan, which had

been recommended for evaluation of CRPS (A.R. at 532).  Dr. Pianta noted that Plaintiff

continued to have hypersensitivity and decreased ROM in the radial side of his left hand along

with tapering of the fingers and atrophy (A.R. at 532).

Plaintiff returned to Dr. Pianta on June 8, 2017 for the results of the three-phase bone

image of his left hand (A.R. at 530).  Although the scan showed no evidence of left distal upper

extremity CRPS, Plaintiff's symptoms remained the same:  dystrophic changes on the radial side

of the hand; well-preserved finger range of motion; tightness of the skin and some shininess

consistent with CRPS; hypersensitivity to even the slightest light touch throughout the radial side

of his left hand; and intact EPL and FPL function in the limited thumb IP flexion (A.R. at 530, 548).  Dr. Pianta repeated that she did not have much more to offer Plaintiff in the way of treatment and expressed her concern that surgical intervention would exacerbate his condition (A.R. at 530).

Plaintiff visited Dr. Pianta on January 9 and 30, 2018 because he was concerned about the condition of his right hand and wrist (A.R. at 834, 838).  Examination of his left hand showed "thinning of the fingers, some color changes in the skin, and some decreased range of motion of the fingers with active flexion" (A.R. at 834, 838).  Dr. Pianta noted that Plaintiff continued to be hypersensitive to light touch of his left hand, particularly on the radial side (A.R. at 834, 838).  Although the MRI of Plaintiff's right wrist showed no occult ganglion, no bone contusion, no joint effusion, and no tendonitis, in response to Plaintiff's concern that his right hand and wrist were following the pattern of his left hand and wrist, Dr. Pianta recommended OT and a second opinion from a hand surgeon (A.R. at 834).

On June 1, 2018, Catherine M. Spath, M.D., evaluated Plaintiff's right wrist (A.R. at 848).  Plaintiff reported that he was not able to use his left hand because of hypersensitivity (A.R. at 848).  In comparing Plaintiff's right and left hands, Dr. Spath noted that the skin on Plaintiff's left hand, particularly the thumb, was shinier, the fingers on his left hand were narrower, and his left fingertips were not well delineated (A.R. at 849).  Plaintiff was able to make a weak full fist with his left hand, but was not able to pull down the "FDPs," particularly on the index finger all the way into the palm (A.R. at 849).  He could "flex the thumb, although not vigorously at the IP joint, and he [could] gently flex and extend the wrist, but [did] so quite hesitatingly" (A.R. at 849).  Plaintiff was "exquisite[ly]" hypersensitive to light touch of the left finger and thumb pad (A.R. at 849).  Dr. Spath noted that, based on the fact that Plaintiff had still

experienced pain when he received a complete motor block, "the neural pathways with his pain response on the left are fairly well ingrained . . . and difficult to treat" (A.R. at 850).  As to Plaintiff's right hand and wrist, Dr. Spath did not have additional recommendations and advised him to "do what he can" (A.R. at 850).

Plaintiff visited Dr. Pianta on December 21, 2018 complaining of increased pain in his right hand (A.R. at 958).  Plaintiff indicated that his left hand remained painful and "quite limiting" (A.R. at 958).  According to Dr. Pianta, Plaintiff's "left upper extremity disability is still such that he is not capable of anything more than sedentary use of his left hand" (A.R. at 958).  Dr. Pianta determined that Plaintiff's right hand pain was caused by overuse because he relied on his right hand to compensate for the limitations of his left hand (A.R. at 958).  Dr. Pianta prescribed OT and a wrist splint at night for his right hand (A.R. at 958).

On January 8, 2019, Plaintiff was evaluated at HealthSouth for outpatient OT of his right wrist and elbow (A.R. at 965, 971).  Plaintiff reported that he aggravated his condition when he cleared brush at his New Hampshire property (A.R. at 979).  The therapist noted hypersensitivity in the fingers of Plaintiff's left hand (A.R. at 973).  Plaintiff was diagnosed with right CMC thumb sprain and right lateral epicondylitis (A.R. at 975).

2.   Mental Health Treatment Records

With Plaintiff facing the possibility of permanent impairment and chronic left hand pain, Dr. Pianta recommended that Plaintiff seek mental health counseling (A.R. at 535).  On August 28, 2017, Plaintiff began treatment with Rebecca Castro, LICSW, of James Levine & Associates, P.C. (A.R. at 807).  He  provided treatment records spanning the period from August 28, 2017 to December 13, 2018 (A.R. at 797-806, 853-78, 953-57).

During the initial assessment, Plaintiff reported feelings of anger and loss of control over his life (A.R. at 797, 807).  He also described the poor quality of his sleep (A.R. at 809).

Plaintiff's therapy sessions focused on controlling his anger and accepting his "'new'" life in which he could no longer use both hands (A.R. at 800, 873).  On September 26, 2017, Plaintiff reported that he felt more hopeful about the future after he received good news concerning his workers' compensation case (A.R. at 800).  Ms. Castro noted Plaintiff's improved mood on October 17, 2017 after the workers' compensation settlement was finalized (A.R. at 803).  On October 24, 2017, Plaintiff indicated that deep breathing and therapy helped him to manage his anger (A.R. at 804).  On October 30, 2017, Plaintiff appeared sad and stated that he continued to struggle with accepting his new functional limitations, but was attempting to focus on the future and how to create a fulfilling life without work (A.R. at 805).  On December 15, 2017, Plaintiff's mood was good and he was feeling less angry (A.R. at 878).  He was purchasing land in New Hampshire (A.R. at 878).  Plaintiff discussed methods of relieving his anxiety on December 18, 2017 and January 3, 2018 (A.R. at 874, 876).

During 2018, Plaintiff reported feelings of frustration and anger as well as improved mood as he attempted to process his inability to use his left hand (A.R. at 852-74, 953-57).  On April 16, 2018, Plaintiff and Ms. Castro discussed ways to reduce Plaintiff's "debilitating" pain (A.R. at 863, 865).  On March 13 and 26, 2018, they talked about "what it will be like for him to work on the property he purchased without having full [use] of his hands" (A.R. at 867, 868).  On June 11, he described being "deeply affected" by his inability to use a chain saw (A.R. at 858).  Although Plaintiff expressed fear about not being able to cut down trees and clear the land at his New Hampshire property in early May, he felt more at peace with his limitations later that month (A.R. at 860, 862).  On September 10, Plaintiff expressed frustration and anger because he

lost the function of his hands (A.R. at 858, 957).  His mood had improved on October 15 and December 10, 2018 (A.R. at 953, 956).

      C.    <u>Opinion Evidence</u>

           1.  Examining Consultant Victor Carbone's Opinion

Psychologist Victor Carbone, Ph.D., examined Plaintiff on December 12, 2017 (A.R. at 811).  Plaintiff described significant "shooting, severe pain" in his left hand, which caused difficulty sleeping and concentrating (A.R. at 811).  His mood and energy fluctuated depending on the amount of pain he was experiencing (A.R. at 811).  He had a medical marijuana card and used marijuana and Aleve to control his pain (A.R. at 812).  Plaintiff stated that his goal for the future was to improve the function of his left hand (A.R. at 813).

He reported that he spent a lot of time at home with his dogs (A.R. at 813).  His ability to perform household chores was limited by his inability to hold objects (A.R. at 813).  Although Dr. Carbone asked Plaintiff to write a simple sentence using his dominant left hand, pain and difficulty making a pincer grip prevented him from holding a pencil (A.R. at 811, 813).

Dr. Carbone assessed Plaintiff as being of at least average intelligence with a good vocabulary (A.R. at 813).  He scored 29/30 on a mini-mental status examination (A.R. at 813). Dr. Carbone opined that Plaintiff was able to understand simple directions and follow three-step tasks (A.R. at 813).

Dr. Carbone observed that Plaintiff's mood was "possibly depressed related to his health condition" (A.R. at 813).  Dr. Carbone diagnosed depressive disorder NOS and cannabis abuse and assessed a Global Assessment of Functioning ("GAF") score of 58 (A.R. at 814).[8]

---

[8] The GAF scale "is used to report a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning at the time of evaluation." *King v. Colvin*, 128 F. Supp. 3d 421, 439 n.16 (D. Mass. 2015) (citing *Gagnon v. Astrue,* Civil Action No. 1:11–

2.      State Agency Non-Examining Consultants' Opinions

On November 7, 2017, M. Douglass Poirier, M.D. conducted a reconsideration assessment of Plaintiff's physical residual functional capacity based on a review of his treatment records (A.R. at 192-95).  Dr. Poirier found that Plaintiff could lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently, although he could only occasionally push and/or pull with his left upper extremity (A.R. at 913). [9]  Plaintiff could stand and/or walk and sit about six hours in an eight hour workday (A.R. at 193).  He could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds (A.R. at 193-94).  Because Plaintiff's ability to handle, finger, and feel with his left upper extremity was limited, he could occasionally grasp, twist, handle, turn, pinch, and manipulate objects with his left hand and wrist (A.R. at 194).  He should avoid concentrated exposure to extreme cold and heat and avoid any hazards, such as machinery and heights (A.R. at 194-95).  Dr. Poirier opined that Plaintiff was capable of performing light work and was not disabled (A.R. at 197-98).

---

CV–10481–PBS, 2012 WL 1065837, at *5 (D. Mass. Mar. 27, 2012)).  "'[GAF] scores may be of help in assessing functional ability, although they are not determinative.'" *Id.* (quoting *Gagnon,* 2012 WL 1065837, at *5) (internal quotation and citation omitted).  "Under previous versions of the APA's Diagnostic & Statistical Manual of Mental Disorders, a GAF score between 51 and 60 would be consistent with moderate symptoms and 'moderate difficulty in social, occupational, or school functioning.'"  *Id.* (citing AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 31 (4th ed. 1994)).  Although the edition of the Diagnostic & Statistical Manual of Mental Disorders that was published in May 2013 no longer used the GAF score, *see Navedo v. Colvin*, Civil Action No. 14–30015–KPN, 2014 WL 6983358, at *3 n.2 (D. Mass. Dec. 9, 2014), "[t]he Social Security Administration . . . has indicated that it will continue to consider GAF scores in disability cases."  *King,* 128 F. Supp. 3d at 439 & n.17.

[9] "Occasionally means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday."  SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

According to Isabel C. Murphy, Psy.D., Plaintiff's depression was not severe and he had no more than mild limitations in his abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself (A.R. at 191).

      D.    The ALJ Hearing

          1.    Plaintiff's Testimony

Plaintiff described how he injured his left thumb and wrist on September 1, 2015 when he was assembling medical equipment (A.R. at 148, 167-69). He stated that after the accident, his left hand swelled and constantly ached (A.R. at 154-55). At times, he felt pins and needles and what he described as "stingers" (A.R. at 154). During the hearing, Plaintiff experienced a "stinger" when pain shot into his left hand and then subsided (A.R. at 151). Plaintiff indicated that any movement of his left hand could "set . . . off" the pain (A.R. at 155). The OT, injections that numbed his arm, acupuncture, and massage therapy did not provide pain relief (A.R. at 155). He used heat, CBD lotion, Aleve "occasionally," and medical marijuana "daily" to alleviate his pain, depression, and insomnia (A.R. at 148-49, 155). Plaintiff feared that surgery would make the pain worse (A.R. at 156).

Plaintiff testified that he lived with his wife and seventeen year-old daughter (A.R. at 149). He did not have any grip strength in his left hand, was not able to pick up small objects or lift anything with that hand, and was not able to hold anything between his thumb and index finger due to "unbelievable" sensitivity (A.R. at 156, 157, 162). The pain in his left hand made it difficult to pull up his pants, use zippers and buttons, and put on his belt (A.R. at 157). He was able to drive, grocery shop, do laundry, and occasionally cook using his right arm and hand

(A.R. at 150-51, 157, 162). Because Plaintiff was limited to using his right arm and hand, he experienced pain in his right elbow and wrist (A.R. at 157, 158).

Plaintiff spent about three hours a day reading his collection of comic books (A.R. at 150, 152). He walked his pit bull terrier on a leash every day (A.R. at 153-54). Plaintiff testified that he did not leave the house often because he was afraid that someone would touch his left hand (A.R. at 164). He had difficulty concentrating "[a]ll the time" (A.R. at 164).

## 2.   The Vocational Expert's Testimony

The ALJ asked Vocational Expert ("VE") Andrea Goldup to assume a person with Plaintiff's age, education, and work experience who could lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently, but could push or pull only occasionally with his left upper extremity (A.R. at 176-77). The person could stand and walk for six hours in an eight-hour day, sit for eight hours, occasionally handle and finger objects with the left, dominant upper extremity and could compensate with the right upper extremity (A.R. at 177). The person could tolerate occasional exposure to extreme cold and heat, but could not be exposed to vibration or hazards such as dangerous moving machinery and unprotected heights (A.R. at 177). The VE testified that an individual with these limitations could not perform Plaintiff's past work, but could work as an usher, a rental clerk, and a counter clerk (A.R. at 177). Although the *Dictionary of Occupational Titles* ("DOT") did not address "the use of a specific upper extremity" for those jobs, the VE based her opinion on her professional knowledge, experience, and research, which indicated that the identified jobs involved only occasional reaching, handling, and fingering (A.R. at 177-78).

As a second hypothetical, the ALJ described an individual with the same limitations as in the first hypothetical, but who was able to lift, carry, push, and pull ten pounds occasionally and

up to ten pounds frequently with only occasional pushing and pulling with the left upper extremity (A.R. at 178).  The VE testified that an individual with these limitations could perform the unskilled, sedentary jobs of call operator, DOT Code 237.367-014, with approximately 50,000 jobs nationally, inspector, DOT Code 669.687-014, with approximately 25,000 jobs nationally, and information clerk, DOT Code 237.367-022 (A.R. at 178).  The VE relied on her professional knowledge, experience, and research to support her opinion about the use of the left versus the right upper extremity to perform those jobs (A.R. at 178-79).  The VE further testified that there were no jobs available for an individual who would be absent from work twice a month or off-task for an hour a day (A.R. at 179).

III.    THE COMMISSIONER'S DECISION

A.     The Legal Standard for Entitlement to DIB and SSI

In order to qualify for DIB, a claimant must demonstrate that he is disabled within the meaning of the Act.  A claimant is disabled for purposes of DIB if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is unable to engage in any substantial gainful activity when he

> is not only unable to do his previous work, but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful
> work which exists in the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or whether a specific job vacancy
> exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration

("SSA").  *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v).  The hearing officer must determine whether:
(1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from a severe
impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to
the regulations; (4) the impairment prevents the claimant from performing previous relevant
work; and (5) the impairment prevents the claimant from doing any work considering the
claimant's age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health
& Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the
hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the
analysis does not continue to the next step.  20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's
Residual Functional Capacity ("RFC"), which the Commissioner uses at step four to determine
whether the claimant can do past relevant work and at step five to determine if the claimant can
adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an
> administrative assessment of the extent to which an individual's medically
> determinable impairment(s), including any related symptoms, such as pain, may
> cause physical or mental limitations or restrictions that may affect his or her
> capacity to do work-related physical and mental activities

SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the
burden to demonstrate his or her RFC.  *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH,
2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801,
806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of
jobs in the national economy that the claimant can perform notwithstanding his or her restrictions
and limitations.  *See Goodermote*, 690 F.2d at 7.

B.    The ALJ's Decision

The ALJ conducted the five-part analysis required by the regulations.  *See* 20 C.F.R. §

404.1520(a)(4)(i-v); *see also Goodermote,* 690 F.2d at 6-7.  At the first step, the ALJ found that

Plaintiff had not engaged in substantial gainful activity since the alleged onset date of September

1, 2015 (A.R. at 44).  *See* 20 C.F.R. § 404.1571 *et seq.*  At step two, the ALJ found that Plaintiff

had the following severe impairments:  CRPS of the left upper extremity, left CTS, and de

Quervain's tenosynovitis of the right upper extremity (A.R. at 45).  *See* 20 C.F.R. § 404.1520(c).

After assessing the so-called "paragraph B" criteria, (1) understanding, remembering, or applying

information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and

(4) adapting or managing oneself, the ALJ determined that Plaintiff had mild limitations in those

functional areas and found that Plaintiff's anxiety, depressive disorder, and cannabis abuse were

non-severe impairments (A.R. at 51-53).[10]  For purposes of step three, the ALJ reviewed

Plaintiff's impairments and determined that his impairments, either alone or in combination, did

not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Pt. 404,

Subpt. P, App. 1 (A.R. at 54).  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step

four to determine whether he could perform past relevant work, and, if the analysis continued to

step five, to determine if he could do other work.  *See* 20 C.F.R. § 404.1520(e).  The ALJ found

that Plaintiff had the RFC to perform sedentary work on the following terms:

> [he] can stand and walk 6 hours in an 8-hour workday.  He can sit 8 hours in an 8-
> hour workday.  [He] can lift, carry, push, and pull 10 pounds occasionally and up
> to 10 pounds frequently.  The claimant can perform only occasional pushing and
> pulling with the left upper extremity.  He can perform occasional handling and

[10] The ALJ used the updated "paragraph B" criteria of the revised SSA regulations that went into effect on January 1, 2017.  *See Covell v. Berryhill,* Civil Action No. 18-10184-DJC, 2019 WL 78995, at *9 (D. Mass. Jan. 2, 2019).

26

> fingering with the left upper extremity, and he can compensate by using his right
> upper extremity.  [He] can tolerate occasional exposure to extreme cold and
> extreme heat.  The claimant cannot tolerate vibrations or hazards, such as
> dangerous moving machinery and unprotected heights.

(A.R. at 54).  At step four, the ALJ found that Plaintiff had not been able to perform his past

relevant work through the date last insured (A.R. at 57).  *See* 20 C.F.R. § 404.1565.  However,

taking into account Plaintiff's age, education, work experience, and RFC, based on the VE's

testimony, the ALJ found that Plaintiff could perform the unskilled, sedentary jobs of call

operator and inspector (A.R. at 58).  *See* 20 C.F.R. §§ 404.1569, 404.1569(a).  The ALJ found

that,

> [a]lthough the [VE's] testimony is inconsistent with the information contained in
> the [DOT], there is a reasonable explanation for the discrepancy.  The DOT/SCO
> does not specifically address use of the left versus right upper extremity. . . . The
> [VE] testified that the occupations cited as call operator and inspector do not
> require more than occasional handling or fingering based on [her professional]
> experience.

(A.R. at 59).  Consequently, the ALJ concluded that Plaintiff was not under a disability at any

time from September 1, 2015, the alleged onset date, through February 22, 2019, the date of the

decision (A.R. at 59).  *See* 20 C.F.R. § 404.1520(g).

IV.    STANDARD OF REVIEW

The district court may enter a judgment affirming, modifying, or reversing the final

decision of the Commissioner, with or without remanding for rehearing.  *See* 42 U.S.C. § 405(g).

Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by

substantial evidence and whether the correct legal standard was used.'"  *Coskery v. Berryhill,* 892

F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)).  The court

reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are

supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the

evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)).  "Substantial-evidence review is more deferential than it might sound to the lay ear:  though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003)).  In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence.  *See Applebee,* 744 F. App'x at 6.  That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

V.   ANALYSIS

A.   The ALJ Erred in Evaluating Plaintiff's CRPS Symptoms

The ALJ concluded that Plaintiff's subjective complaints of pain were not consistent with the sum of the record evidence (A.R. at 55).  Plaintiff contends that the ALJ's assessment of his statements about the limits in the function of his dominant left hand due to CRPS pain were speculative and not adequately supported by the record (Dkt. No. 19 at 14-16).  The Commissioner argues that the ALJ's conclusions were supported by substantial evidence (Dkt. No. 24 at 14-17).  Plaintiff's position is persuasive.

The ALJ did not refer to Social Security Ruling ("SSR") 03-2p, entitled "Titles II and XVI:  Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome," which describes CRPS as:

a chronic pain syndrome most often resulting from trauma to a single extremity. . . . [It's] most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. . . . It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual.

SSR 03-2p, 2003 WL 22399117, at *1 (Oct. 20, 2003).  SSR 03-2p observes that "[t]he signs and symptoms of [CRPS] may remain stable over time, improve, or worsen." *Id.* at *5.

SSR 03-2p instructs that "[c]laims in which the individual alleges . . . CRPS are adjudicated using the sequential evaluation process, just as for any other impairment." *Id.* at *6. In determining the RFC in CRPS cases, ALJs must consider "all of the individual's symptoms . . . in deciding how such symptoms may affect functional capacities." *Id.* at *7.  "Careful consideration must be given to the effects of pain and treatment on an individual's capacity to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Id.*  Opinions from medical sources and from third parties are important when assessing the "severity of the impairment(s) and the individual's RFC." *Id.*

SSR 03-2p directs ALJs to follow SSR 16-3p when evaluating the intensity and persistence of an individual's symptoms, including pain. *See id.* at *7.[11]  SSR 16-3p provides, in pertinent part,

[f]irst, [the ALJ] must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain.  Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . .

---

[11] SSR 03-2p references SSR 96-7p, 2003 WL 22399117, at *7.  SSR 97-7p was rescinded and superseded by SSR 16-3p for decisions made on or after March 28, 2016.  *See* SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017).

SSR 16-3p, 2017 WL 5180304, at *3.  In evaluating "the intensity, persistence, and limiting

effects of an individual's symptoms" at the second step, *id.,* the ALJ initially considers "whether

the claimant's alleged symptoms are consistent with the objective medical evidence."  *Martin v.*

*Berryhill,* Civil No. 18-cv-461-JL, 2019 WL 1987049, at *5 (D.N.H. May 6, 2019).  *See* SSR 16-

3p, 2017 WL 5180304, at *5; *see also* SSR 03-2p, 2003 WL 22399117, at *6.  If objective

medical evidence does not support a favorable decision, the ALJ must consider the entire case

record, including "statements from the individual, medical sources, and any other sources that

might have information about the individual's symptoms . . . as well as the factors set forth in the

[SSA's] regulations."  SSR 16-3p, 2017 WL 5180304, at *5; *see also* SSR 03-2p, 2003 WL

22399117, at *6.  Those factors are:

> 1. Daily activities;
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2017 WL 5180304 at *7-8 (citing 20 C.F.R. § 404.1529(c)(3)).  *See also Avery v.*

*Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986).  The ALJ must explain which

of the claimant's symptoms she found "consistent or inconsistent with the evidence in [the]

record and how [her] evaluation of the individual's symptoms led to [her] conclusions." SSR 16-

3p, 2017 WL 5180304, at *8.

Here, the ALJ accepted that CRPS could reasonably be expected to produce Plaintiff's

pain (A.R. at 55).  At the second step, the ALJ cited Plaintiff's October 2017 function report of

daily living activities, the type of medication he used, and opinion evidence to conclude that notwithstanding "pain, weakness, and restrictions," Plaintiff "still demonstrates a capacity to use the [left hand]" (A.R. at 55-57).  Although the ALJ's failure to refer to SSR 03-2p in reaching that decision may not require reversal, the ALJ's determination rests on factual and legal errors.

1.    Objective Medical Evidence

In evaluating Plaintiff's statements about the limits in his use of his left hand, the ALJ ignored objective medical evidence that was consistent with Plaintiff's reports about the intensity of his pain.  *See Nguyen*, 172 F. 3d at 35 (an ALJ is "not at liberty to ignore medical evidence").

> The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence.  Examples such as reduced joint motion [and] muscle spasm . . . illustrate findings that may result from, or be associated with, the symptom of pain [and] may be consistent with an individual's statements about symptoms and their functional effects.

SSR 16-3p, 2017 WL 5180304, at *5.  The ALJ's credibility assessment disregarded the remarkably consistent records from Plaintiff's treating care providers who observed severely painful muscle spasms and who were not able to conduct tests that involved touching or manipulating his left hand (A.R. at 423, 435, 440, 491, 498, 534, 541, 579, 831).  Even Dr. Carbone observed that Plaintiff's pain prevented him from holding a pencil (A.R. at 811, 813).

2.    Daily Activities

The ALJ placed significant weight on Plaintiff's October 2017 function report, in which he reported that he could drive, walk his dog about a mile each day, occasionally prepare meals, do laundry and yardwork, shop, and spend time with his family (A.R. at 55, 56).

"A claimant's 'ability to struggle through the activities of daily living does not mean that []he can manage the requirements of a modern workplace.'"  *Alvarado v. Comm'r of Soc. Sec.,*

31

Civil No. 12-1379 (MEL), 2014 WL 1237087, at *3 (D.P.R. Mar. 26, 2014) (quoting *Punzio v.*

*Astrue,* 630 F.3d 704, 712 (7th Cir. 2011)).

> "The critical differences between activities of daily living and activities in a
> fulltime job are that a person has more flexibility in scheduling the former than
> the latter, can get help from other persons . . . , and is not held to a minimum
> standard of performance, as []he would be by an employer."

*Santana v. Colvin,* Civil Action No. 15-cv-13232-IT, 2016 WL 7428223, at *7 (D. Mass. Dec.

23, 2016) (alteration in original) (quoting *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir. 2012)).

*See Ormon v. Astrue*, 497 F. App'x 81, 87 (1st Cir. 2012) (per curiam) ("there is a 'difference

between a person's being able to engage in sporadic physical activities and her being able to

work eight hours a day five consecutive days of the week.'") (quoting *Carradine v. Barnhart*,

360 F.3d 751, 755 (7th Cir. 2004)).

The ALJ's finding that Plaintiff's October 2017 function report was inconsistent with his

January 2019 hearing testimony was flawed in several respects (A.R. 55, 142, 157, 162, 367-74).

First, in finding that the 2017 function report was at odds with Plaintiff's 2019 testimony – given

some fifteen months after he completed the report – the ALJ did not take into account the fact

that CRPS may progressively worsen.  *See* SSR 03-2p, 2003 WL 22399117, at *5.  Further,

Plaintiff's longitudinal treatment records do not support the weight that the ALJ afforded to

Plaintiff's function report.  *See Stephanie N. v. Saul,* C/A No. 1:20-2027-SVH, 2021 WL 777560,

at *22 (D.S.C. Mar. 1, 2021) (SSR 03-2p and SSR 16-3p direct the ALJ to consider the entire

record when evaluating a claimant's subjective complaints of disabling pain).  From Plaintiff's

first visit to Dr. Wenner in September 2015, when Plaintiff described his pain as "exceedingly

severe and incapacitating," to his December 2018 visit to Dr. Pianta, Plaintiff's descriptions of

his pain were remarkably consistent (*see, e.g.,* A.R. at 481, 482, 484, 491, 497, 534, 539, 540,

545, 587, 651, 671, 675-76, 958), as were the objective manifestations of CRPS.  *See Stephanie*

*N.,* 2021 WL 777560, at *22 (in rejecting the claimant's subjective complaints of disabling CRPS

pain, the ALJ erred by failing to consider whether the claimant's descriptions of her symptoms

were consistent throughout the record); *see also* SSR 16-3p, 2017 WL 5180304, at *8 ("If an

individual's statements about the intensity, persistence, and limiting effects of symptoms are

consistent with the objective medical evidence and other evidence of record, we will determine

that the individual's symptoms are more likely to reduce his or her work-related activities . . . .").

Finally, when assessing Plaintiff's allegations concerning the effects of his symptoms on his

ability to function, the ALJ did not address the discrepancy between her assessment of Plaintiff's

subjective symptoms and the reports of the occupational therapists who documented the

limitations on Plaintiff's use of his left hand that were caused by pain (A.R. at 440, 499, 515,

522, 524 ["Gains noted in ROM (since February 17, 2017) however pain continues to progress

and prevent (Plaintiff) from functional use."]).  *See* SSR 03-2p, 2003 WL 22399117, at *7 ("In

cases involving . . . CRPS, third-party information, including evidence from medical

practitioners who have provided services to the individual and who may or may not be

'acceptable medical sources,' is often critical in deciding the individual's credibility.").  "[N]one

of the individuals who provided treatment to Plaintiff suggested that Plaintiff was malingering or

that he was not experiencing the pain he described." *Bratnichenko,* 2019 WL 3281275, at *15.[12]

---

[12] As the Commissioner points out, the ALJ discredited Plaintiff's testimony in part based on
Plaintiff's 2016 and 2017 HealthSouth OT records concerning Plaintiff's grip strength in his left
hand (Dkt. No. 24 at 16 n.10).  Although HealthSouth recorded Plaintiff's left grip strength as 5
pounds on June 15, 2016 and 100 pounds on February 17, 2017, the Commissioner overlooks the
inconsistency between the February 2017 record and Plaintiff's May 4, 2017 HealthSouth OT
discharge summary, which indicates that he had not met the stated goal of improving the grip
strength of his left hand, that the strength in his left upper extremity was "impaired," and that
progressive pain "prevent[ed] . . . [the] functional use" of his left hand (A.R. at 499, 515, 521,
522, 524).

The ALJ engaged in impermissible speculation when concluding that Plaintiff must have relied on his left hand to cut brush in New Hampshire and to walk his dog each day. *See* 20 C.F.R. § 404.953(a) (the ALJ's decision must be based on "the preponderance of the evidence offered at the hearing or otherwise included in the record.").  The ALJ highlighted the alleged inconsistency between Plaintiff's statement in his October 2017 function report that he was "no longer able to do yard work" with the January 2019 OT record indicating that he aggravated the condition of his right hand while clearing brush in New Hampshire (A.R. at 55, 370, 965, 979). As to the dog, te ALJ found that "he[] requires some degree of ability to handle taking on and off the harness/leash.  It also requires the ability to maintain a grip on the restraint if the animal [becomes] excited" (A.R. at 55, 56).  The ALJ conducted a "quick Google search" and noted that "pit bull terriers [may] weigh between 29 and 65 pounds" (A.R. at 56 n.4).  Based on that information, the ALJ concluded that Plaintiff "could be required . . . to be able to pull (resist) greater than light exertion in order to restrain his dog should it become excited" (A.R. at 56 n.4). There is no evidence in the record to show that Plaintiff used his left hand to cut brush in 2019 nor is there a description of Plaintiff's dog or its leash or any evidence that his dog ever required restraining using his left hand.  The ALJ's findings about supposed contradictions between Plaintiff's account about the intensity and persistence of his pain and his ADLs are based on impermissible speculation.  *See Rodriguez v. Astrue*, 694 F. Supp. 2d 36, 43 (D. Mass. 2010) ("the ALJ's gratuitous speculation is quintessential legal error.").  *Cf. Rivera v. Marriott Int'l, Inc.*, 456 F. Supp. 3d 330, 337-39 (D.P.R. 2020) (denying a party's request for the court to take judicial notice of a website for the truth of its contents) (citing *Starbrands Capital, LLC v. Original MW Inc.*, Civil Case No. 14-12270 (ADB), 2015 WL 13691435, at *4 (D. Mass. Aug. 4, 2015); Fed. R. Evid. 201(b)).

3.      Plaintiff's Medication and Other Treatment

The ALJ's reliance on Plaintiff's record of treatment for his impairment is similarly

flawed.  The record supports the ALJ's finding that Plaintiff did not treat his pain with

prescription medications including opioids (A.R. at 55).  *See* 20 C.F.R. § 404.1529(c)(3)(iv)

("[t]he type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . .

pain or other symptoms" is one factor the ALJ considers in assessing symptoms such as pain);

SSR 16-3p, 2017 WL 5180304, at *8 (same).  Plaintiff used over-the-counter Aleve, medical

marijuana, and CBD lotion on his hand for pain relief (A.R. at 55, 148-49).  *See* SSR 03-2p,

2003 WL 22399117, at *3 (anti-inflammatory medication, such as Aleve, is used to reduce

CRPS pain and improve mobility).  Plaintiff, however, had an eminently reasonable explanation

for this choice.  Plaintiff told treatment providers that he was "generally reluctant" to take

prescription medication because he "did not like the way [it] made him feel" (A.R. at 482, 530,

539, 545).  *See Sanders v. Saul*, No. CV-18-0266-TUC-LCK, 2019 WL 2996058, at *4 (D. Ariz.

July 9, 2019) ("intolerable side effects are a legitimate reason to decline prescription

medication"); SSR 16-3p, 2017 WL 5180304, at *10 (same).  He also reported a family history of

"significant substance abuse" to Dr. Carbone (A.R. at 812).  The ALJ never questioned Plaintiff

about why he declined prescription medication and she did not address the legitimate explanation

he offered for his choice.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th

Cir. 2008) ("[A]lthough a conservative course of treatment can undermine allegations of

debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the

claimant has a good reason for not seeking more aggressive treatment."); *Johnson v. Colvin,* No.

13-C-1023, 2014 WL 2765701, at *5 (E.D. Wis. June 18, 2014) (ALJ may need to inquire into

claimant's reasons for declining to take prescription medication before making a finding as to

credibility); *Campbell v. Astrue*, C/A No. 8:08-02018-CMC-BHH, 2009 WL 2750080, at *3 (D.S.C. Aug. 25, 2009) (remand was required where the ALJ's decision did not address whether the reasons offered by Plaintiff as to why he took non-prescription medication for pain were credible); SSR 16-3p, 2017 WL 5180304, at *9-10 ("We will not find an individual's symptoms inconsistent with the evidence in the record . . . without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.").

In addition, the ALJ considered the fact that "the frequency of the spastic and shooting pain in the left upper extremity has decreased in documentation [and] noted[ed] that after June 2017, there is little evidence of treatment for the left hand" (A.R. at 55).  The ALJ ignores Dr. Pianta's notes of October 13, 2016 and June 8, 2017 stating that she "did not have much more [treatment] to offer" Plaintiff (A.R. at 530, 538).  *See Biggs v. Apfel,* No. 99 C 3446, 2000 WL 1346702, at *3 (N.D. Ill. Sept. 14, 2000) (the ALJ erred by failing to consider Plaintiff's lack of medical treatment in the context of the evidence that nothing further could have been done for his hand).

### 4.    Opinions

The ALJ also relied to varying degrees on opinions or reports of Dr. Spath, Dr. Pianta, and Dr. Poirier, the state agency consultant, when assessing Plaintiff's descriptions of the severity of his pain and crafting the RFC (A.R. at 56-57).  For claims filed on or after March 27, 2017, such as Plaintiff's, a "medical opinion" is defined as "a statement from a medical source about what [an individual] can still do despite [his or her] impairment(s) and whether [the individual] has one or more impairment-related limitations or restrictions in [one or more specified] abilities," including the ability to perform the physical demands of work activities,

such as lifting, carrying, pushing, pulling, or other manipulative functions, such as handling objects. 20 C.F.R. § 404.1513(a)(2)(i). *See also* SSR 03-2p, 2003 WL 22399117, at *7 (when assessing the severity of CRPS and crafting an the RFC, the ALJ is required to consider "opinions from an individual's medical sources, especially treating sources, concerning the effect(s) of . . . CRPS on the individual's ability to function in a sustained manner in performing work activities, or in performing activities of daily living . . .").

The ALJ's RFC assessment erroneously relied on Dr. Spath's findings to conclude that the evidence did not support a "total prohibition" on Plaintiff's use of his left hand for gross and fine manipulation (A.R. at 56). Plaintiff visited Dr. Spath *once* for an evaluation of his *right* hand and wrist (A.R. at 848). *See* 20 C.F.R. § 404.1520c(c)(3)(i)-(iv) (when determining the weight to be afforded a medical opinion, the ALJ must consider the length and extent of the treatment relationship, frequency of examinations, and purpose of the treatment). Dr. Spath's observations about Plaintiff's *left* hand were consistent with his reports of pain: she noted the appearance, limited movement, and "exquisite sensitivity" of Plaintiff's left hand and she did not opine on his ability to use that hand for sustained activities in an occupational setting (A.R. at 848-50). *See* SSR 96-8p, 1996 WL 374184, at *7 (the RFC describes "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) . . . ."). *See also* SSR 03-2p, 2003 WL 22399117, at *7.

As to Dr. Pianta, the ALJ afforded "significant consideration" to her December 21, 2018 alleged opinion that Plaintiff "was not capable of more than sedentary use of his left hand" and relied upon it to support the determination that Plaintiff was not "completely prohibited from using the dominant left upper extremity" (A.R. at 56). Like Dr. Spath's assessment, Dr. Pianta's

comment was made during Plaintiff's visit for treatment of his *right* hand (A.R. at 958).  *See* 20 C.F.R. § 404.1520c(c)(3)(iii).  Again, the doctor did not opine on the impact that the functional limitations of Plaintiff's left hand would have on his ability to perform sustained work-related activities, so the statement was not a "medical opinion" for purposes of assessing the severity of Plaintiff's impairment or determining the RFC (A.R. at 958).  *See* 20 C.F.R. § 404.1513(a)(2); SSR 03-2p, 2003 WL 22399117, at *7.  In addition, by disregarding Dr. Pianta's September 8, 2016 note that Plaintiff's "significant" pain prevented him from "any meaningful use with [sic] his left hand," the ALJ impermissibly cherry-picked records instead of properly analyzing all of the evidence that was relevant to Plaintiff's statements concerning the severity of his pain (A.R. at 540).  *See Ares v. Berryhill*, Civil Action No. 16-cv-11439-IT, 2017 WL 5484674, at *5 (D. Mass. Nov. 15, 2017) ("Although an ALJ need not address all evidence in the record, and the failure to mention evidence is insufficient to show that the ALJ did not consider it, an ALJ may not cherry-pick evidence to support his or her findings without referencing contradictory evidence.") (citation omitted).

Dr. Poirier's assessment of Plaintiff's physical RFC was the only opinion that fit the regulation's definition of a "medical opinion."  *See* 20 C.F.R. § 404.1513(a)(2).  The ALJ gave Dr. Poirier's physical RFC evaluation "some consideration" and incorporated into the RFC his opinion concerning Plaintiff's limitations on pushing, pulling, and manipulating objects with his left upper extremity (A.R.. at 57, 193-94).  However, the ALJ erred by failing to comply with the requirement that she address the inconsistencies between Dr. Poirier's opinion that Plaintiff could use his left hand occasionally and the contrary record evidence.  *See* 20 C.F.R. § 404.1520c(c)(1), (2) (the supportability and consistency of a medical opinion with the other evidence from medical and nonmedical sources must be considered when assessing the opinion).

The record does not include any opinion evidence from treating providers concerning Plaintiff's "ability to function in a sustained manner in performing work activities." SSR 03-2p, 2003 WL 22399117, at *7.  *See Santiago v. Sec'y of Health & Human Servs.,* 944 F.2d 1, 7 (1st Cir. 1991) (per curiam) ("an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person."). "The ALJ was not free to construct an RFC based on her own lay person's interpretation of the medical record." *Bratnichenko,* 2019 WL 3281275, at *16.  *See Gordils v. Sec'y of Health & Human Servs.,* 921 F.2d 327, 329 (1st Cir. 1990) (per curiam) ("since bare medical findings are unintelligible to a lay person in terms of [RFC], the ALJ is not qualified to assess [RFC] based on a bare medical record.").  The duration and severity of CRPS should be assessed by, among other things, clinical records containing "a detailed description of how the impairment limits the individual's ability to function and perform or sustain work activity over time."  SSR 03-2P, 2003 WL 22399117, at *5.  The ALJ's findings that Plaintiff could perform "occasional handling and fingering with the left dominant upper extremity" and "occasional handling and fingering with the left dominant upper extremity" were not findings that the ALJ could make as a matter of commonsense, *see id.*, and these findings were not supported by opinions from Plaintiff's treating medical sources.  *See id.*, at *7 ("Opinions from an individual's medical sources, especially treating sources, concerning the effect(s) of RSDS/CRPS on the individual's ability to function in a sustained manner in performing work activities . . . are important in enabling adjudicators to draw conclusions about the severity of the impairment(s) and the individual's RFC.")  SSR 03-2p provides that "when additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the [ALJ] must make every reasonable effort to obtain additional information that could shed light on the credibility of the

individual's statements."  SSR 03-2p, 2003 WL 22399117, at *8.  *See Cook v. Berryhill*, Civil

Action No. 17-cv-11764-IT, 2020 WL 6712261, at *3 (D. Mass. Nov. 16, 2020) ("It is the ALJ's

duty to investigate the facts and develop the arguments both for and against granting benefits.")

(citing *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000)).  On this record, remand is warranted in order

for the Commissioner to "reassess, after any proceedings that may be suitable, the severity of

[Plaintiff's] symptoms, including his pain . . . , taking into account the entire record and obtaining

any expert medical opinion needed to further illuminate the medical records." *Nguyen*, 172 F.3d

at 36.

> **B.**   The ALJ's Step Two Determination that Plaintiff's Depression and Anxiety were
> not Severe Impairments was Supported by Substantial Evidence

Plaintiff's contention that the ALJ erred at step two by finding that his depression and

anxiety were not severe impairments does not merit an extended discussion (Dkt. No. 19 at 9-

13).[13]  Substantial evidence supported the ALJ's determination (Dkt. No. 24 at 9-14).

At the second step of the sequential evaluation analysis, the ALJ is required to determine

whether the claimant has proved that his or her "impairment or combination of impairments is

severe, meaning that the impairments significantly limit the claimant's physical or mental ability

to do basic work activities." *Balaguer v. Astrue*, 880 F. Supp. 2d 258, 265 (D. Mass. 2012)

(citing 20 C.F.R. § 404.1520(c)).  An impairment is not severe at step two where "medical

evidence establishes only a slight abnormality or combination of slight abnormalities which

would have no more than a minimal effect on an individual's ability to work even if the

individual's age, education, or work experience were specifically considered." *Barrientos v.*

---

[13] Although the ALJ found that Plaintiff's depressive disorder, anxiety, and cannabis abuse were
non-severe, Plaintiff limits his challenge to the decision concerning depression and anxiety (A.R.
at 51).

*Sec'y of Health & Human Servs.,* 820 F.2d 1, 2 (1st Cir. 1987) (per curiam) (citations and internal quotation marks omitted).  The expert opinions, along with Plaintiff's treatment records, activities, and the absence of treatment by medication for a mental condition provided substantial support for the ALJ's determination that Plaintiff's anxiety and depression, either singly or in combination, caused no more than "mild" limitations in the four broad areas of functional limitation (A.R. at 52-53).

VI.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 18) is GRANTED.  Defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. No. 23) is DENIED.  The case is remanded for further proceedings consistent with this memorandum and order.  The Clerk's Office is directed to close the case on this court's docket. It is so ordered.

Date:  May 20, 2021                          /s/ Katherine A. Robertson
                                             KATHERINE A. ROBERTSON
                                             U.S. MAGISTRATE JUDGE